Next case is 091454. Wordtech Sys v. Integrated NTWRK Solutions. Mr. Gibson? Yes. Good morning. My name is Chris Gibson. I represent the three appellants. I'd like to address two arguments. Damages and invisible liability. I'd like to start with damages. In this case, Point of Wordtech did not seek lost profits. Instead, it sought a reasonable royalty and specifically a running royalty. Wordtech asked the jury to apply a 12% royalty rate to INFC's sales. Wordtech did not ask for a lump sum royalty, but that is what the jury awarded. The jury's verdict contains three lump sum royalty numbers. The jury did not award a running royalty, and the verdict form makes that clear. The verdict form asks the jury that if the verdict is based upon a running royalty, the jury was to specify the percentage or the per unit rate. The jury left that portion of the verdict form blank in each of the three areas where the jury was asked to answer that question, meaning that the jury's verdict contains three lump sum royalty numbers. On appeal, Wordtech's burden is to show that substantial evidence supports these lump sum royalty awards. The Lucent v. Gateway requires that result. This court decided to use it last fall. It's, I think, directly on point and I think should control the damages issue in this case. In this case, most substantial evidence supports an award of lump sum royalties. I discussed it in the brief, but I'd like to highlight some key points. First, Wordtech, that trial, did not even ask for a lump sum royalty. That was not part of its theory of trial. In the trial, there was no substantial evidence of either an established lump sum royalty or a hypothetical lump sum royalty. What about the three licenses that were submitted as part of the evidence showing lump sum on the items that were infringing? Wordtech submitted a number of license agreements. Two or three had lump sum royalty provisions. Well, according to the record, there were three. Let's say there were three. As I understand the law, in the trial case, to have substantial evidence of an established royalty, you have to have enough evidence to show that that royalty rate is established. Now, I've not found a case that has three agreements as opposed to ten, but I think that three agreements is not sufficient to show there is general acquiescence in the royalty rates that are in dispute, especially when there is such a variation between the royalty numbers, between I think $175,000 and $350,000. The second problem with each of those three agreements is that in these agreements, Wordtech released the licensee from patent infringement claims. This court has made clear in Hanson and in other cases that a license agreement which results from an infringement case is not evidence of an established royalty. Those license agreements were not necessarily lump sum agreements. They were fully paid-up licenses. So we're talking about a fully paid-up license not only covering whatever past conduct there may have been but also future sales for the duration of the patents. That's true. Isn't that the distinction you should be arguing? Well, I think there are two distinctions. One distinction is what's the difference between a running royalty and a lump sum royalty, and I think with a lump sum royalty, the parties get together at the outset. They decide they don't want to have some issue in the future about what the sales are going to be, so they just agree, we don't know what your sales are going to be, but you pay us $1 million, you can use our invention forever. That's a lump sum royalty. But you're trying to make the distinction between a lump sum settlement and a fully paid-up license. What I'm saying is that's the issue that concerns me because the jury had before it license agreements that amended to fully paid-up licenses. It was a lump sum payment but for a fully paid-up license. So the question in my mind is how does that correlate with a damage award in the form of a lump sum payment for past infringement? I don't think we can know, and that's really my point, and I think that's the point of these cases, which suggests that when you have an agreement which results from a patent infringement claim, as in this case, you have a lump sum royalty agreement where the licensee agrees to pay $175,000 for one, a release of patent infringement claims, and two, the right to use the invention in the future. But was there an injunction in this case? No, I didn't see one. There's no way for the trier of fact to know how much of that amount, how much of that $175,000 is for the release of the patent infringement claim or for use of the invention, and that I think is the purpose of the case law. If you just look at those agreements, the jury can't determine, the trier of fact can't determine how much of that payment went for use of the invention as opposed to the release of the claim. That's the point, I believe. I want to shift gears a little bit to the individual liability, and in particular to the question of induced infringement. Normally when we consider induced infringement or contributory infringement, we look first to whether there's direct infringement. When I looked through this multi-page jury verdict, and I can't find anything that talks about direct infringement. Is it in here anywhere? Not expressly. I mean, is it here anywhere? Well, I think when the jury was asked if substantive evidence shows infringement of the patents, I think inferentially that's a finding of direct infringement. But I agree with the court that there is nothing in the verdict where the jury was asked directly, was there a direct infringer? Who was it? What were the damages? But that is not expressly part of the jury verdict. I also noticed that the jury verdict throughout every question talks about inducement or contributory infringement. Was inducement an issue set forth in the pre-trial order? No. Well, I'm sorry. Yes, it was. In the pre-trial order? Well, I saw the jury infringement. I didn't see inducement. I don't recall. There was discussion generally about infringement. I think the issue was just whether each of the three defendants in print. I don't know that it was broken down specifically. Was there any oral argument made by Word Tech about inducement, induced infringement? There was no argument at trial on inducement by either party. And there was no jury instruction on inducement? No jury instruction on inducement. Yet the verdict, the jury verdict form has inducement everywhere. Yes. And without mentioning explicitly direct infringement. Yes. And we have the issue of contributory infringement because the evidence was, as to the individuals, I wonder if this case is litigated under U.S. law. I don't know. I had a feel from fundamental issues. It's almost incomprehensible. I was not counsel at trial. I have read the records, but I was not counsel at trial. In terms of having participated in drafting this verdict, I was not part of that. But what's curious about this verdict is that it contains 248 yes or no questions. And the jury went through every single one, answered every single question yes on inducing and contributory and perhaps infringing on the direct infringement. We think that result is not even theoretically possible because the only evidence was that INSC infringed. There was no evidence of any non-party infringing. So the only possible infringers were INSC and the two individuals who only acted as employees. So I think that means that unless you have a non-regal claim, the only direct infringer can be INSC as to every claim. So how can INSC be liable for inducing infringement and contributing to infringement? I think the verdict form is theoretically a result that is just not possible under the facts of this case. And that's why... What about the individual liability? Why don't we cover that for a second? Why shouldn't the two individuals be directly liable directly with the shell of the corporation that does not exist? Let me address that two ways. First, there is I guess a suggestion if not an explicit claim on appeal that the two individuals were the alternators of INSC. That was never a claim in trial. There was non-complaint, non-memento complaint, non-pre-trial order. It was not argued to the jury. The judge did not instruct the jury on alter-legal liability. There was never a claim at any time that the two individuals were the alter-legals of INSC. Or was it a corporate bail appeal? That was not an issue at that point. That was never addressed. There was never an issue in this case. Never an issue at any time. Not in the complaint. Not in the pre-trial order. Not argued at trial. There was no discussion of that to the jury which resolved these issues. And then Wertech also makes the claim that INSC was not a valid corporation. And you read Wertech's brief and it sounds as though there may be some sort of a mystery about this, but there is not. INSC is a Nevada corporation. It has filed papers with the Nevada Secretary of State. Those papers are in the record. Nevada law requires corporations to file statements of officers every year. And INSC did that in 1994 and 1995 and then it stopped. And as a matter of law, under Nevada law, as a matter of law, INSC was then considered to be in default. And it was in default for a number of years. But then in 2006, two years before trial, INSC filed a certificate of revival. Were some of the counsels in Wertech according to the record? Perhaps, but it was filed. And at the same time that the corporation filed the certificate of revival, it also filed a new statement of officers. Nevada accepted INSC's fees, filed those documents, and as a matter of Nevada law, once that certificate of revival was filed, INSC was revived. And the revival relates back to the period, to the beginning of the default. So, under Nevada law, to quote the statute, once there was a revival, it's as if the corporate right had at all times remained in full force and effect. That's in Nevada Revised Statute 78.740. That's also in the Nevada case law. Under the rental case, REDL, which we cited, that case discusses corporate revival, and also says that if a corporation is revived, that the revival can relate back to the period of default, the entire period of default. So, as a matter of Nevada law, once this revival was filed in 2006, two years before trial, that had the effect of reviving the corporation, which is deemed at all times they have been in good standing. Well, there is a California Ninth Circuit case interpreting Nevada law, which essentially states that during that time period, there is liability to the individuals in Nevada legislation. Directors on whom it placed the obligations of a trustee during dissolution would avoid the consequences of breaching his trust. Now, in that particular case, which is Miller v. Waiyu at 235 FedSec 612, the corporation was dissolved, and then during that time of dissolution, there was an indication that maybe the directors who were trying to revive the corporation should be personally liable for their breach of fiduciary obligations. The directors here were the two individuals, plus a third. There were three directors. During the revival period, if in fact actions were taken which would impose liability on the individuals who failed in their corporate fiduciary obligations, why shouldn't that particular case apply? Well, as to Mr. Esadian, he was never an officer at any time. Mr. Katemi was an officer. The filings in 1994 and 1995 specify that Mr. Katemi was an officer, but nothing specified that Mr. Esadian was an officer or a director ever at any time. There is no dispute about that. As to Mr. Katemi, he was named as president in 1994, I believe secretary in 1995, and I believe he was named as a director in 1995, and then there wasn't a situation where the corporation was dissolved. The corporation continued to operate, it just didn't file the required annual statement with the state of Nevada, and then did file that statement in 2006. So during that time period it was not a good stamp. That's correct, it was. And so the question is what happens when it revived in 2006, and I think we're going to have to rely on a brief study. I'll wait to see if there's time. Thank you. We'll give you a minute or two. Thank you. Can you follow Mr. Martinez? Good morning, your honors. May it please the court. My name is Christian Martinez, and I represent Word Tech Systems. I just wanted to start out by addressing the evidence in the lower court, which was the license agreements. Firstly, I want to point out there were actually four license agreements that had lump sum amounts stated in them. Two of them were fully paid up front, and then two of them were hybrid agreements where there was a set amount plus a royalty rate. In this case, there were two agreements, one for $24,000 plus 4%, and one for $45,000 plus 4%. And then, of course, there were two agreements, one for $350,000 up front with no royalty rate after that, and then one for $175,000, similar circumstances, no royalty rate following the lump sum. None of these agreements involved actual litigation, and there's no evidence in the lower court that there was any threat of litigation or any rattling of the saber. But how did those agreements provide substantial evidence for the jury award here? Well, I think under Lucent, the agreements provide figures that one could characterize as ballpark figures. They're not out of the ballpark, and it's true that the agreements do vary in amounts. And they vary in terms of the time period of the infringing or potentially infringing action? Well, the agreements involve companies that either make or they might make devices that would possibly be covered by the patents. Do we have any idea of the volume of sales or projected sales? None of that was discussed in the lower court because it involved the give and take. It's the trial court that's a lower court. I'm sorry, it's the trial court, Your Honor. Of course, I don't consider it a lower court, but with the trial court, none of that was discussed. But I would submit that when one considers the give and take that is inherent in a lump sum license agreement, one of the factors is whether or not you're going to expand your devices. And what happened with the Flake-O-Epson license agreement, which Mr. Miller testified to in the trial court, is that he was approached by Cisco, and he testified that they were unsure what they were going to do in the future, but they wanted to make sure that their product lines were going to be covered if they elected to move into the auto loader industry. And I think that as far as the... What is in effect here, a 23% loyalty? If you look at the sales volume, that was not contested, and the actual award, it's effectively a 26.3% loyalty. My question is, what substantial evidence supports that jury finding? Well, Your Honor, firstly, I would like to point out that Mr. Asadi did testify that there were actually additional infringing devices, so it's not solely on the invoices. However, the jury was presented with license agreements that consisted of higher amounts, which would be the $350,000 amount. But again, that license agreement didn't have any... didn't discuss in any way any volume of sales that could conceivably have covered sales 10 times, 100 times the sales in question here, correct? Theoretically, that's correct, Your Honor, but this is a tightly knit industry, which was testified to in the trial court. The companies all tend to be relatively cottage industries with the exception of a few large companies, such as Seiko. And I think that what you presented with, Your Honor, is a situation of what would be reasonable under the circumstances. And when you have a situation where defendants in this case, as the lower court, the trial court pointed out, were less than credible and were also essentially stonewalling as far as what documents are available to reflect actual sales and their sales volumes, then any consequences of that should be construed against them under the Lam case. However, notwithstanding that, I would also submit that one would have to stand in the shoes of the parties. And what we have in this case is a defendant that was essentially selling devices that they bought. They were not making devices. The other licensees were manufacturers. They were makers of these devices. So what we have is a situation where the defendants testified that they customized some software, which is really easy to duplicate, which is discussed in the Microsoft case, Your Honors, and they install it onto these autoloaders and then they turn around and sell it. They testified that they bought it for $2,000 from the Fortuna company and they sold it for anywhere from $10,000 to $14,000. And that's for the Robocopier 600 series. For the Robocopier 8000 series, they testified that they bought them for between $4,000 and $5,000 and they turned around and sold them for anywhere between $25,000 and $51,000. Were there any findings of direct infringement? I believe there was, Your Honor. During the trial, we went through the claims in front of the jury and we had a demonstrative exhibit, which Mr. Miller testified to. Did the jury make a finding of direct infringement? Well, with respect to the jury verdict, I believe that they did because it states that it simply asks if they find that the claims were infringed and there were jury instructions as to what infringement is. The jury verdict asks if you look at, for example, the first page, infringement, defendant INSC, has WordTech proved by a preponderance of evidence that Robocopier 8000 infringes? And then it says, A, inducement, B, contributing. How can a device induce infringement? Well, a device cannot induce infringement. However, in this case, we have the two defendants who were selling the devices. I understand that, but what I'm asking is, what was it that you were asking the jury to decide? Well, Your Honor is referring to page 8 of the jury verdict form? Yeah, appendix page 8. Well, essentially what that would involve, I would submit to the court, is exactly what the dictionary definition is of inducement. But that's what I was asking. Where is the finding by the jury of direct infringement? Well, my response to that is, is that, Well, on the jury verdict form, Well, on the jury verdict form, there is no box to check for direct infringement. However, the jury was instructed as to what infringement is, and I believe that when one considers the instructions in total, the jury was not misled in the circumstances, Your Honor. So the jury instruction instructed the jury on what direct infringement was. The jury verdict form didn't specifically ask them to find direct infringement, and at the same time, the jury instructions didn't instruct the jury on inducement, but the verdict form asked them over and over and over again on inducement. Do I have a correct understanding of what the documents reveal? Well, it's correct that there was an omitted instruction as to inducement, and as far as the contributory infringement, there were instructions on that, which would encompass what a direct infringement is. On inducement, was there any, Was inducement an issue set forth in the pre-trial report? Not that, not inducement, actually I believe that's your answer, no. I didn't see anything. Well, Your Honor, I was, I don't believe the word inducement was used in the pre-trial order, Your Honor, so I would have to say no. How about in the closing argument? Was there any argument made on inducement? Yes, there was, Your Honor. In the closing argument, I did point out that when they were, when the defendants were alleging that there was no activity by themselves, what I pointed out is that if the defendants are not infringing, then who is infringing? And not only that, Your Honor, the devices were being sold to customers, to other individuals, and they were being modified and assembled to an extent. I saw arguments about contributory infringement, but I didn't see anything about induced infringement. Did I miss something? I believe that during the closing argument it was brought up and my reply to the defendants' closing argument did include statements that the devices were being sold for others to use and that it was undisputed that they were being sold for other parties to use. But you didn't specifically argue inducement? I didn't use the word inducement, Your Honor. Let me ask you a question regarding the corporate status of IC&S. Was any evidence presented regarding the existence of the corporation so that the individuals who were essentially running the corporation as officers or otherwise could be personally liable without the corporate bail being pierced? Yes, Your Honor, I believe there was. As the district court pointed out, there was evidence tending to show that it was not operating as a corporation. During the trial, the documents were presented to show that there was no corporate filings, and Mr. Asadian, and I should point out also that in the defendant's reply brief, the list of officers, there were actually four lists of officers. However, two of them were altered, and I don't know why or how they were altered, but the reply brief references that there were two, but there were actually four. How does that establish a legal piercing of corporate bail? Well, I'd like to point out that Mr. Asadian was put on the stand, referencing your question, he was put on the stand, and he was asked about the corporate structure, and he didn't know anything about the corporate structure, and Mr. Asadian is the individual that was designated by the defendants as the person most knowledgeable about the corporate structure. And as the defendants can see, once they do not keep up with their corporate filings, the corporation is essentially revoked. And it's true that one can revive it in Nevada, which is a very forgiving state, but it's not going to be effective against individuals that would be harmed by the revival. So what case do you have for that? Actually, that's the Nevada revised statute, that's 78.0295, Your Honor. Well, the statute itself does not provide that. There's no equitable basis for establishing the liability of individuals. Once the corporation is revived, it goes back to the original time period as if the corporation was in good standing during that entire time period under Nevada statute. Yes, Your Honor, but again, the Nevada revised statute does say that when a file is going to be corrected, that it will be effective except for those that will be harmed by that correction, and that's the 78.0295. And then I would also point out that case law provides that, and again, the Miller case is one that I would reference, and that would involve the equity principles. And also with respect to the piercing the bail, there was ample evidence that this was a two-person operation. Ms. Godseyan was the defendant in the action. She defaulted, and the defendants testified at the trial court that Ms. Godseyan was not coming into the office since 2000. And that essentially leaves these two individuals as the directors and officers of the corporation. Was there a jury instruction on piercing the corporate bail? No, there was not a jury instruction. And one last question. Am I correct that you, on the damages, you did not present any expert witness or any expert testimony on damages? Only Mr. Miller. There were no retained experts to discuss damages, although I would submit that Mr. Miller is much more of an expert than anyone we would be able to present it as an expert or a recipient witness. Thank you. I'd like to make two points. There is obviously case law on what it takes to pierce a corporate bail. That has not been briefed. In the district court, we talked about that. Okay. My point is that if piercing the corporate bail was an issue at trial, there would have been an instruction on that. Someone would have made a finding on whether the corporation should be disregarded in the individual liability imposed on Mr. Esadi and Mr. Pitini.  And later, after the trial, when the judge denied the defendant's motions, he made the comment about there's some evidence in the record about the status of INSC, but there was never a finding by the judge or anyone that showed that the corporate bail should be pierced or that the corporation should be disregarded. That was not an issue for anyone. I'd like to make one other point about the verdict form. One other, I think, odd thing about the jury's decision is that plaintiff sought damages for infringement of three patents, but in counsel's argument at the close of trial, he asked for one number. He said, I want you to apply a wealthy rate to the sales figure. I want $114,000. There was never any discussion or testimony or argument about how much should be awarded for infringement of each of the three patents. But that's what the jury did. The jury awarded three separate numbers, even though there was no argument on that point and no evidence on that point. And that's another part of the jury's verdict, which I think shows that it was based upon speculation and guesswork. Thank you. Thank you. The case is submitted.